UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
UNITED STATES OF AMERICA,

                              25 MJ 1928-UA

     -vs-
                              BAIL HEARING

JOSEPH MORI,

                    Defendant.

------------------------------------x

                              United States Courthouse
                              White Plains, New York

                              July 8, 2025


Before:   THE HONORABLE JUDITH C. McCARTHY,
               United States Magistrate Judge


A P P E A R A N C E S:

JAY CLAYTON
     Acting United States Attorney for the
     Southern District of New York
MARGARET VASU
     Assistant United States Attorney

ELLIOTT KWOK LEVINE JAROSLAW NEILS LLP
ILENE W. JAROSLAW
     Attorney for Defendant

**Transcribed from digitally recorded proceedings**

OFFICIAL COURT REPORTER
DARBY GINSBERG, RPR, RCR (914) 390-4102

THE DEPUTY CLERK:  In the matter of the United States of America versus Joseph Mori.

Counsel, please state your appearances for the record.

MS. VASU:  Good afternoon, Your Honor.  Margaret Vasu for the government.

THE COURT:  Good afternoon, Ms. Vasu.

MS. JAROSLAW:  Ilene Jaroslaw for Joseph Mori.  Good afternoon, Your Honor.

THE COURT:  Good afternoon, Ms. Jaroslaw.  Okay.

And good afternoon, Mr. Mori.

THE DEFENDANT:  Thank you, Your Honor.

THE COURT:  We are here because there is a request to change a bail condition, and the government is objecting to it.  There is also some procedural issues on whether this court is the appropriate place to even have this application heard.

So perhaps we should hear the procedural issue first and decide whether I even have the authority to hear it.

MS. JAROSLAW:  Well, Your Honor, if I may, there are some practical realities that we are dealing with.  Just yesterday we got a date from the Court in Utah, and Mr. Mori's initial appearance was scheduled for Tuesday, August 5th, which is, of course, a month from now; and these are ongoing businesses that require his attention, so as a practical matter, if Mr. Mori were to, you know, drop all his business responsibilities, he would lose his business and his livelihood.

And for that reason, we believe it's important, certainly as a practical matter, to address the condition that Mr. Mori not be engaged in his business activities.  And I think it's fair to ask, really does 3142 demand on the facts alleged in this indictment against Mr. Mori and one of the companies, does that mean that a defendant should be barred from all of his business pursuits?

And I think that's really out of proportion to what's alleged in the indictment, and it's certainly not necessary to secure the safety of the public, and rather, it's punitive.  You know --

THE COURT:  Before we get to the facts --

MS. JAROSLAW:  Sure.

THE COURT:  -- the reality is, is that I've got to deal with the procedural issue.

MS. JAROSLAW:  Understood.

THE COURT:  And I don't use the August 5th date as a controlling date because if 3145 applies here -- 18 U.S.C. 3145 applies here, that statute says the motion shall be determined promptly, which means that they would have to hear any appeal.

And the way it typically works under 3145 -- I've had them come in, you know, appeals come in from other -- other jurisdictions that are coming here, they are handled by our district judges promptly.  Even the magistrate judges are not allowed to hear appeals from -- of another magistrate judge in

another district.

But one of the questions I have -- and this is for you, Ms. Vasu -- this was a Grade 2 bail application, right?

MS. VASU:  That's correct, Your Honor.

THE COURT:  So does 18 U.S.C. Section 3145 actually apply in those conditions?

MS. VASU:  Well, it wouldn't apply to an appeal to the actual order that Your Honor issued back in June because that wasn't agreed to -- as Your Honor mentioned, both parties agreed to the conditions and agreed to that -- those bail conditions.

However, were the Court today to, for example, agree with the defense and decide to remove that condition of bail, and the government wished to appeal, 3145 would apply because that would be an appeal to the partial release order.

THE COURT:  If you -- any order I issue today is appealable to Utah.

MS. VASU:  Certainly.

THE COURT:  And, you know, a stay can be asked immediately from either side, depending on which way it went, and that typically is also -- I mean, it can be done by me, but it's typically also made to Utah.

MS. VASU:  I apologize.  I may have misunderstood the Court's question.  Do you mean, then, does this application made by the defendant here today constitute an appeal under 3145?

THE COURT:  Yes.  Because if it constitutes an appeal

under 3145, it -- I don't have jurisdiction because then the appropriate place for that would have been Utah, if the application had been made in the wrong place; if 3145 applies to this application by the defendant to modify the bail conditions, or is it still under, you know, the original 3142 statute.  And my question, you know, ponders like the reading of 3145 is, there is no question that any appeal of an order by me -- and technically, I issued an order -- would go to Utah.  I want to know what would happen, like whether that changes when it was an agreed-upon bail package that I accepted and ordered.

MS. VASU:  Your Honor, I don't actually believe that there is any reason to think that because it was an agreed-upon bail package, it was accepted and ordered unless there were a circumstance put forth by the defense, which I don't think is the case here.  There's been no material change to circumstances, which would of course always allow a defendant to come back before the magistrate judge who issued the original order to reconsider in light of changed circumstances.  I do not see an assertion of changed circumstances in the defense's letter here.

MS. JAROSLAW:  There are no changed circumstances, but it occurs to me that if the agreed-upon bail package were called something different, say a temporary order of detention, then we'd be entitled to a hearing about the permanent order of detention.  So is the fact that we did or did not label

something temporary versus permanent make a difference --

THE COURT:  But it wasn't temporary.  Those conditions that were put in place were put in place, agreed to by counsel, before me on June 11, 2025.  I don't have to accept, by the way -- you know, when I -- when the parties give an agreed-to bail package, there have been times -- not a lot -- but there have been times where I may change the conditions on it, lessen something, increase something, and -- and then I issue an order, and that is the order.

Now, that order can always, in my opinion -- and I will tell you, there are different opinions about this throughout the country.  Some magistrate judges believe they can -- when someone comes in on a 5(3)(c), they cannot review the bail terms and conditions that were put in by a magistrate judge in another jurisdiction.

In this jurisdiction, we do review them, and we do look at them kind of fresh and keep them, and we hear argument and usually, you know, something's changed, but I -- I can tell you, I have had theoretical conversations with some of my colleagues throughout the country that they don't believe that they can review it.  They believe that if it wasn't something that was like it should have been appealed to the district judge, and the district judge in the original jurisdiction -- original jurisdiction here is Utah; but that's -- but there -- but it was an order put in place.  So it wasn't a temporary

order that we are going to be evaluating at a later time.  It was a court order put in place, and even if there was changed circumstances, I'm not sure that comes before me either except arguably it could, but that's not an issue here because you said there are no changed circumstances from the first time.  So I don't really have to worry about that, and the less I have to worry about, the better for me.

So the real issue is when there is an order that's been put into place by me, whether the mechanism that is the one to be going under is 18 U.S.C. Section 3145, and that would then be heard by a judge in the original jurisdiction, which is Utah, and it does say the motion shall be determined promptly.

MS. JAROSLAW:  And of course, promptly is difficult when the defendant lives in the Southern District of New York and has no ties and does no business in Utah.  It's somewhat difficult to do that.  I mean, in my experience, even with these cases under Rule 5, certainly modifications as to travel have happened, like defendants are told they can only travel in the Eastern and Southern District of New York, if a family member is ill in Albany, which is the Northern District, you know --

THE COURT:  But have you seen it happen when there's objections?  Because when there's not objections, I've seen modifications, and one could argue under 3142 that those could happen because everybody is agreeing to it, and there arguably could be a changed circumstances or someone ill or sometimes I

see it where, you know, especially for delivery people or people who have businesses that they have to go into the tri-state, and, you know, we include Jersey, and now we have to include Pennsylvania given that where they live and where the business is going to take them.  Everybody agrees to that, and we modify that, and I've seen those modified.

I can't say whether I've seen them modified on someone that -- I haven't paid enough attention -- modified on someone that we are supervising because technically, you know, Mr. Mori is being supervised here, but the case really is coming out of Utah, and I don't know -- I don't know where those applications to modify are made.

You know, Ms. Vasu, you know, do you have any experience with this?

MS. VASU:  I have only been on the receiving end of such applications --

THE COURT:  And do you know -- receiving end like you are -- someone -- bail was put in in the original jurisdiction or because they came here, and we re-adopted bail or put in a new one?

MS. VASU:  Where someone was presented on a 5(c)(3) in another jurisdiction, and when they arrived here, there was an argument about bail; and once they arrived here, it was a new institute of bail.

THE COURT:  Yeah.  And I think that's typically how we

do it, which would be then why any modification on travel or stuff like that would come to the judge here because the person was residing here, the case was here.

MS. JAROSLAW: Yeah, my experience is similar, but typically the situation is the defendant is in custody, and they get transferred here, and that's when the application was made to have the defendant released on terms. It seems to me whether or not the parties agree, whether it's a travel restriction, reducing the amount of cash bail, or in this case telling whether he can or cannot conduct his businesses, it seems that whether the parties agree isn't really a factor as to whether the Court has authority to do it. It just, as a practical matter, nobody is going to complain about it.

But the jurisdiction is an interesting question, and I must say I haven't had the situation where the government has opposed it.

THE COURT: Yes.

MS. VASU: If I may, Your Honor, first and foremost, I just wanted to put something quickly on the record. It came to my attention in the course of preparing for today's hearing and in drafting the government's response that I had a prior professional relationship with one of the cosigners to Mr. Mori's bond. I have disclosed that relationship and details regarding the nature thereof to defense counsel, but I just wanted to note it for the Court as well.

THE COURT:  Okay.

MS. JAROSLAW:  And I have disclosed that we had children at the same preschool 25 years ago.

THE COURT:  Okay.

MS. VASU:  So we have covered all our bases.

But in response to the argument just put forth, you know, this is an appeal because the government is objecting.  If the government were consenting, it would not constitute an appeal.  So I think that is -- it's not so much a matter of convenience or difficulty, it's a matter of how this moves forward within the court system.

THE COURT:  And the -- you have, I assume, conferred with the AUSA in Utah, and you are aligned in your position, and they -- because you had put a different date than August 5th; you had put July 28th.  So the date is actually August 5th.

MS. VASU:  That's correct, Your Honor.  I have conferred with the AUSA in Utah, and we are relying both on the procedural and on the substantive position the government is taking today.  The different date is just that defense counsel had copied me on an email to the AUSA asking for July 28th as the date, and when I last spoke to the AUSA yesterday, he didn't have an update on that date.  So at the time, that was the only date I was aware of being discussed by the parties.

THE COURT:  And there is no -- there is no term or none -- not a single one of the businesses that -- because I

believe there are 14 companies here that the U.S. Attorney's Office is comfortable with Mr. Mori being -- working in.

MS. VASU:  So I may have misread, and I apologize.  I understood the defendant's motion to be with respect to three companies.

THE COURT:  Just those three?

MS. JAROSLAW:  Yes, Your Honor.

THE COURT:  And those are the three that you've evaluated, looked at, and believe there are issues?

MS. VASU:  Yes, Your Honor.  I think that is certainly true of two of the companies, both Global and 90 Sterling.  Both of those companies -- Global is the one that's mentioned in the indictment that defense counsel already mentioned, and it appears from what I could see on some publicly available websites, that Global is either a subsidiary of or somehow otherwise within the corporate family of 90 Sterling.

You know, we -- with respect to the transport company, that does seem to be in a different business based on the representations that are made in the letter here, which is distinct from the other two.

However -- and I don't know if the Court now wants to discuss substance.  I do have some concerns about the information that's been put forth here.

THE COURT:  Let me hear a little bit about substance, and I -- while I ponder whether I even have jurisdiction.

MS. JAROSLAW:  So, Your Honor, Global is a business that is active in providing IT services, cloud services, data servers, and other things I know very little about.  However, they do have a great deal of customers.  They do -- they service them in the IT space.  From what I understand, during the period that Mr. Mori was incarcerated for the other offense, sales and customers went to zero, and it basically took him months and months to build back his customer base.  It is an entirely legitimate business, and it just seems grossly disproportionate to say that because this deposit happened in a Global or this wire transfer occurred in a Global account, that my client has to just walk away from the business entirely.  I mean, it is a thriving business doing legitimate work.

I allude in my letter to Mr. Mori's attempts to return the money that didn't go back with the clawback because it had been transferred to a different account, and I've got the emails between him and the FBI.

In addition, it was very strange, as you can imagine, in October of 2023, to have this number deposited in his account and then two days or three days later disappear.

And if it's material to the Court, I spoke today to Mr. Mori's business lawyer.  He was going to retrieve his notes, but does remember that contemporaneously Mr. Mori said, this is really weird.  This amount was deposited, and then it was clawed back or released, whatever was in the account, and the lawyer

said, you should get in touch with the bank and try to pay it back. And my client did, and basically, he ran into a brick wall. The bank refused to discuss it with him.

And then a few months later when the FBI contacted him, again, he had about a 20-, 30-minute conversation, and in it he's like, yes, this was weird. I have always been ready to pay this back. I don't have all the money now -- this is when he is building back his business -- but I would like to pay it back, and I need the instructions on how to do that. That was in a phone conversation. And then in email correspondence that I have the agent said he is looking into it. We will get him that information, and that's February 2024, and nothing happened after that until Mr. Mori's arrested.

So this bizarre transaction happens with no evidence of Mr. Mori's own involvement, and yet because he transferred some of the money to another account during the interim period, suddenly it's money laundering, conspiracy to commit money laundering; and we will deal with the merits of that at a plea or a trial or however, maybe a dismissal, but at this stage to say he can't operate this legitimate business because of this bizarre situation that happened in October of 2023 -- a year and a half ago -- seems, you know, as I said, disproportionate and overly punitive.

THE COURT:  Yes, Ms. Vasu?

MS. VASU:  Your Honor, I just would first want to make

a note with respect to the indictment out of Utah, and as the Court knows, I, of course, was not privy to that grand jury presentation, but I believe it's of note that in paragraph 2 of the indictment, the accusation is that Mr. Mori entered into a conspiracy to commit money laundering and that that was in assistance of a scheme to defraud a Utah municipality and a minor victim of a swimming accident.

So it seems like the allegation isn't:  Oh, this money just happened to fall into this account, but that he had some sort of agency in this money coming into his account.  I don't have any additional information to provide further color on that, but that's just something I wanted to point out to the Court.

Now, in terms of the conduct here and whether or not this condition of release is punitive, I think it's also important to note the defendant's criminal history here.  We've only spoken about this case that's the indictment in Utah, but as the Court knows, the defendant was convicted of wire fraud here in this District.  He was sentenced to a year and a day by Judge Karas, and the information for --

THE COURT:  Which he's still technically on supervised release, right?

MS. JAROSLAW:  Correct.

MS. VASU:  That is absolutely correct, Your Honor. And he was during the course of the alleged conduct as

articulated in the Utah indictment as well.

In that information to which Mr. Mori pled it states that he essentially was using a business that he owned and operated that was called Partner Care to defraud people out of basically with an advanced fee-type scheme that seems to have elements of a Ponzi scheme added into it as well because some people received their fees back, but from monies that were provided by later victims. And that shows, I think, a pattern of conduct that is a real reason to question the assertions in the defense's letter that Global is completely uninvolved in any kind of problematic conduct, especially considering the nature of the statements in the indictment coming out of Utah.

I also -- you know, I was briefly able to speak with defense counsel before we started today's hearing to try to get an understanding of where some of the information provided about these various companies was coming from, and I understand that defense counsel did have an opportunity to view these sort of certificates of incorporation, registration, and things along that line -- along those lines, but I don't really have an understanding of where the information about annual revenue, nature of work, number of employees, you know, this $1 billion contract that's with the Ivory Coast, where that is coming from, and that seems crucial to the Court's decision here if the Court is going to decide on the merits.

I think that in light of the prior conduct with the

wire fraud; the fact that that also involved an owned-and-operated company; the fact that he was on supervised release; the nature of the charges in the indictment out of Utah, and just quickly looking at the pre- -- the report from pretrial services, you know, the statements here about the valuation of some of these companies are eye-watering.  It says here that 90 Sterling Road is valued at $20 billion.  That's an astronomical amount that, you know, even a publicly traded company over 10 billion is a large cap; a privately traded over 1 billion is a unicorn.  The notion that this company is worth 20 billion seems really, really, really high without a lot of information about what the company does.  And, you know, I think you can glean more from what someone has done than from what they say, and here, we have the $340,000 that's still owed in the criminal court restitution.

I will note for the Court that the original restitution order, which was entered in 2022, was in the amount of $354,000 four -- excuse me -- $354,410.  So give or take $14,000 has been paid off on that.  When the defendant has ownership in companies that are worth this much, I think that begs some question about the actual value and function of these companies and whether these dollar amounts are real, and it gives the government real pause about him being allowed to continue to operate these businesses.

And again, the condition is not asking for the

businesses themselves to be shut down.  I understand that defense counsel says that sales eventually went to zero over the approximately one year, whatever he ended up serving in prison; but, you know, 30 days is what we are talking about here.  Just so if the Court in Utah can make its own decision, it's more familiar with the case, and for all of those reasons, we do submit that it would be inappropriate to modify the bail as requested.

MS. JAROSLAW:  Your Honor, I don't think it's actually a binary choice to totally grant our motion or totally deny it.  One possibility is that my client is willing to grant full access to the accounting, the bank records on the going-forward basis of his companies; and he was in the process of setting up an online accounting system for Global, and once he does that, he would give the government a read-only login, so at any time they could go in there so they can have some assurance that the company isn't being used for fraud.  Mr. Mori has nothing to hide about what he is doing with Global.

THE COURT:  Ms. Vasu?

MS. VASU:  Your Honor, you know, I'm unfamiliar with that type of monitoring outside of the context of sort of child sexual exploitation cases.  It sounds like overviewing the accounting of a company that has asserted to be significant would be quite a burden on pretrial services, I assume.

THE COURT:  I don't think pretrial is qualified, you

know.  I spoke to Cindy before and Simon before.  They wouldn't know what they were looking -- they could have online, but you know, they would know something coming in flagged, they don't know what they are looking for.  Actually, I don't think pretrial can do that kind of monitoring.  That doesn't mean that the U.S. attorneys can't do it and don't want to take on the responsibility or an agent can't do it and won't take on it, but I don't know how -- I couldn't do it.  I couldn't understand what I was looking at without knowing more of the facts of the case.

So I'm not sure that -- you know, in the world of, you know, child sex abuse and that monitoring, you could see when something nefarious is happening.  That is -- you know, that sticks out.  It's very difficult on businesses if, you know, could be totally legit or as the government says, there could be, you know, illegal things happening and transfers happening in this country -- country -- company, I mean.  So I don't even know how that monitoring would work from pretrial being the monitor.

MS. JAROSLAW:  I completely agree with all of that, and what I have in mind is more of an FBI agent.  You know, there are many that are trained in financial analysis, doing spot checks unannounced, visits to the site unannounced, you know, log-ins to the accounting.  You know, just getting the bank records on a regular basis.  So they wouldn't be doing it

as a full-time job, but totally unknown to Joseph Mori, the FBI could be just checking out his company at any time.

I mean, it would also serve as a deterrence if you are concerned about Mr. Mori doing this because he would know at any moment he could be questioned about any of this, and he would have to give truthful answers.

And in addition, I'm confident that he is not going to be using this company or any other to commit crimes during the pendency of his case.

THE COURT:  Now let me ask you, did -- have you had any of these conversations with the actual AUSA in Utah handling this or --

MS. JAROSLAW:  No.  And the reason for that, unfortunately, my *pro hac vice* motion was submitted June 24th, and because of an error in the clerk's office, an admitted error, it didn't get granted until this morning.

THE COURT:  Okay.  So here is my decision:  One of the reasons I wanted to hear some argument on the substantive part of this is because I think it shows why 3145 is actually one of the reasons it actually exists because if a magistrate judge is making a decision in another district about a case that they know little about, they just know the person has been arrested there, it wouldn't be right for a district judge in this circuit to listen to that appeal or to listen -- you know, to make any modifications to whether release or terms of conditions because

we really just don't have the facts.  And so it really is more appropriate to be handled by Utah.

I do think 18 U.S.C. Section 3145 applies here.  I believe that 18 U.S.C. Section 3142 doesn't apply.  Primarily, there is no change of circumstances.  Everybody had consented to this.  I had issued an order back I think it was on June 11th.  And this decision -- not just by order of modifications -- but this decision is also appealable, and I do think this order is reviewable and appealable in the district of original jurisdiction.

Under Section 3145(a), which is what I am looking at to make this decision, it does say that any motion made in the -- the court having original jurisdiction over the offense should be determined promptly.  I believe that knowledge of the underlying facts of this case by both the AUSA you will have -- you know, as the attorney you will have -- is best heard in Utah.

So I am denying it without prejudice, however, to bring it because you very well may be able to modify that order in such a way that -- that they feel comfortable with what you are offering is of a review, and that may be something that, for whatever reasons they want, whether oversight review or just, you know, information to have that they would want that.  They may agree to that.  They may not.  But I do think that's the best place for it.

Now, if they determine that they don't have jurisdiction and I do, then you come back before me, but I hate doing this because I know how important it is to Mr. Mori, you know, and I don't want to be, you know, kicking the can down the road or skirting responsibility.  I do think that this section applies in the unique circumstances of this case.

I don't think it applies -- I kind of agree with you, Ms. Vasu, Ms. Jaroslaw -- that if everybody agreed to the change, I probably could just sign it and put it in; but once it becomes, you know, a disagreement and argument needs to be heard, you know, I think that's the right forum.

I do want to know, however, if it's not -- if that forum tells you it's not, even if I am not on duty, you know, let my chambers know because this is a unique situation that I have not had before; and based upon my preliminary review just to the statute, I will be honest, I have not done -- had the time to do full legal research on it, but based on that language of the statute, this is my finding.  But if you should find something different or something different should happen, please let me know.

I am going to ask Ms. Vasu -- you, of course, are going to contact and do whatever procedurally you need to do, Ms. Jaroslaw -- but, Ms. Vasu, I expect you to let your counterpart in Utah know, and also let your counterpart in Utah know that I -- although I have no control over this, my

expectation that under this statute it has to be promptly heard, you know, my expectation, and one of the reasons I am making this decision the way I am is because of that language in the text, which is that it has to be promptly heard, and that I don't see August 5th as prompt.

The statute may -- the case law may be different, but from the limited I know, I am expecting this to be heard sooner rather than later in the same way we would hear an appeal sooner rather than later, but I have no jurisdiction over their schedules or anything like that.  But it is -- that is understanding that there was not going to be, you know, a full month before this can be heard is one of the reasons I also feel more comfortable deferring to Utah.

MS. VASU:  Understood, Your Honor.  I'll convey that.

THE COURT:  Thank you.

MS. JAROSLAW:  Thank you, Your Honor.

THE COURT:  Okay.  Good luck, everyone.  Have a good day.

THE DEFENDANT:  Thank you, Your Honor.

-o0o-

Certified to be a true and accurate transcript of the digital electronic recording to the best of my ability.

/s/ Darby Ginsberg

U.S. District Court
Official Court Reporter